This is the best. Viola Water versus the City of Atlanta. Can you imagine? The best in this case. The contract. Mr. Lowry. Good morning. Unless you care to direct me otherwise, I thought I might start with the pre-judgment interest issues. The first error in pre-judgment interest was the District Court denying my client, Viola, any pre-judgment interest from August 2011 through July 2016. This is pre-judgment interest on unpaid invoices that went back to 2005. So what happened is in the 2010 trial, the District Court found the City had to pay those invoices, and he gave us pre-judgment interest through that August 2011 judgment. You remanded, we went back down, and we said, you got to update our pre-judgment interest through May 2016. Otherwise, we're uncompensated for five years of interest under the contract, which says we get interest until the sums are paid. Without explanation, the District Court didn't give us that interest. This issue is controlled by Sunbeam, the 2007 published decision. And what happened in Sunbeam is you got that case in 2007, you had had it in 2005, and you had remanded. You'd said, yeah, this jury award of damages of $6.6 million is just fine. But you'd remanded it because the District Court didn't correctly calculate the pre-judgment interest. In 2007, you had to correct the District Judge again because the District Judge hadn't updated the pre-judgment interest through the remand judgment. Just what happened here. You said that's error. You said unless we tell you to do otherwise, you start post-judgment interest with the new remand judgment, and you run pre-judgment interest up to that. That cost us about $2.2 million. The City says that there is a subsequent unpublished Sunbeam opinion that somehow justifies the result below. Respectfully, my colleague is misreading that unpublished opinion. What happened in that unpublished opinion, by now you had the case for the third time. The other party finally wakes up and says, wait a second now. If they get more pre-judgment interest, the District Judge should have updated our award. And you quite rightly said, no, you had to tell us that last time because our mandate was really clear in the 2007 decision, and it applied only to updating Pentalpha's interest. So that 2008 opinion that I think my colleague will tell you about is driven solely by the mandate rule. Perhaps they'll also tell you about a 5th Circuit decision from 2015, obviously not binding. That's the Art Midwest decision. In the Art Midwest decision, the 5th Circuit said the District Court shouldn't have updated interest through the remand judgment. The opposite of what we say should have happened here. But here's the explanation the 5th Circuit gave. It said because on remand the District Court calculated damages by choosing one of two predetermined amounts without reopening the evidentiary record, it should have run pre-judgment interest only through the prior judgment. Well, that's different. The District Judge didn't award any predetermined amount. But you did reopen the evidentiary record. We had a two-day evidentiary hearing. This case is controlled by Sundeim. I also think, by the way, Art Midwest is just the wrong rule and inconsistent with Sundeim. You don't have to reach that issue because it's so clearly distinguishable. Here's the second pre-judgment interest award error. This one cost us another about $2.2 million. The District Court this time awarded the city pre-judgment interest through May 2016 on the $9 million that it spent on these belt presses. Now, what's wrong with that? Here's what's wrong with that. In July 2006, when they terminated this agreement, they seized $9.5 million of our money under a letter of credit. They were entitled to do that. And that letter of credit was set up exactly so the city would have the money in hand to repair any damages we caused to the plant after the contract was terminated. Then, over the next two years, they spent $9 million on belt presses, $9 million we had already given them before they spent the first penny. Now, pre-judgment interest compensates for a delay in payment, right? And a letter of credit, you know, it specifically avoids by design the delay in payment that would otherwise justify pre-judgment interest. And the pre-judgment interest entitlement, by the way, in this case, comes from Section 20.20 of Joint Exhibit 20, which is the contract. And it says you get pre-judgment interest on sums that are, quote, not paid when due, close quote. We paid before anything was due. We don't get tagged with pre-judgment interest. And notably, the city doesn't try to justify on the merits why it should be getting pre-judgment interest on money we paid them 10 years ago. They have a law of the case argument. They said, wait a second, last time we got some interest on these damages, so it's law of the case that we get this interest. But what that ignores is what you did in the 2013 appeal. And this is set out in the reply brief. It's a little complicated orally, but here's the gist of it. Last time, the district judge had given us full pre-judgment interest on the whole $9.5 million of the letter of credit. We got the time value of that money back from the city. And you guys said, no, that's wrong. The city was entitled to take that money, was entitled to keep the time value of that letter of credit money. But in doing that in your mandate, the fourth prong of your mandate said, by the way, you've got to fix anything else that's affected by the things we've corrected, including specifically the city's pre-judgment interest offset. So your mandate not only gave the district judge permission to get this right, but you told him, take a look at this and get it right this time. And he didn't. And it cost us another $2.3 million. So think about the combined effects of this. We get no pre-judgment interest on money we hadn't been paid since 2005. We lose five years of that pre-judgment interest. They get pre-judgment interest through 2016 on money we paid them 10 years ago. It can't be right. You've got to reverse those things. Now, let's talk about this avoided costs issue. This is a factually complex issue, but I don't want you to mistake factual complexity for a factual dispute. This record cannot sustain the district court's finding that the city avoided only $84,000 in costs in running 40% of the sludge through this massive plant through alternative equipment for 25 months. In other words, the city's claim is they spent $9 million to pay a contractor to do something the city says they could do for $84,000 under normal conditions. I've got some thoughts on this, but before I do, are there particular questions you all have about this issue? I have a few questions. Yes, Your Honor. Number one, it looks to me like in your brief you do not challenge the legitimacy of the district court's method, namely the method of comparing the operating costs during period three with the operating costs during period four. You do not challenge that as a legitimate method. Rather, you only point to flaws in the application of that method. Am I not correct in that regard? This is the best answer I can give you. At a completely high level of abstraction, we do not dispute that you can prove damages with a before and after method. But as many courts have held, you've got to do it right, otherwise it does not provide a rational basis for judgment. Okay, well, you give three reasons why this was not applied correctly. One, comparison to plant-wide rather than just dry-side costs. Yes, Your Honor. Seems to me that they have a pretty good answer on that, that the only figures they had were plant-wide figures. Your Honor, that can't change their burden of proof. Speculation doesn't become reasonable certainty based on how a party maintains its records outside the ordinary course of business. Here's maybe even a better answer. When they wanted to break out the costs, they did. They brought online a new facility at this plant in the comparison period. If they had left those numbers in, it would have greatly distorted the analysis in our favor and against them. When they wanted to reasonably estimate out part of the expenses, they did so. They didn't want to this time. They could have. That's on—that's the Westside CSO. If you look at page 7— I'm familiar with that. Thank you, Your Honor. Your second claim flaw is the— The monthly variations. Monthly variations. And it seems to me that they have a pretty good answer to that, namely that they use a monthly average rather than any particular month, which tends to mitigate that problem. And secondly, the major costs, the two major costs, electricity and gas, do seem to be consistent in both cost and consumption volume used throughout. Let's reverse the order and let me answer you. Starting with power, the district judge's analysis, by which he concludes what you just said, is flawed for two reasons. It analyzes full calendar years of utility consumption. I understand that. But if you do understand that, what you also should understand, as we set forth in our brief, is if you actually break it out by the relevant periods, which run—which cut across calendar years, power consumption does go up in the comparison period. Twenty-five percent more natural gas and some percentage more electricity that I can't remember as I stand here. So if you do the analysis and actually just match it up to the months where they didn't have belt presses—and this is set forth in our main brief, Your Honor. I've got a separate section on utility costs. But going back to the averaging, you're right. The city says averaging negates the effect of these variations. That is nonsense and we proved it with math. Math is math. It can't be disputed. It isn't disputed by the city. A one-month timing difference makes a $3 million difference in the bottom line. If they were really measuring avoided costs as opposed to sewage flow, the timing of large payments, the payment of large invoices and purchasing, if they were really measuring avoided costs, I shouldn't be able to show you that a one-month timing difference changes the result from $84,000 to $3.4 million. If I can show you that, and I have, and they don't dispute it— What page of your blue brief do you show that? I believe it is—seems like I should know that, doesn't it? I think it's page 30—I think it's page 33 of the brief, the main brief we discussed this, and I discussed it again in the reply brief. So I think you're looking 37 to 38 of the main brief, and there's a clear separate section in the reply brief on this. 37, 38. 37 to 38 in that range of the main brief, and by the time I stand back up here, I'll have the right pages. That'd be fine. Thank you. Do I have more questions now or should I sit? I should sit. Thank you. Good morning. May it please the Court. I'm Bill Shepard on behalf of the city of Atlanta. I'm going to take it in the reverse order from Mr. Lowry. The law in Georgia—and Veolia doesn't argue they didn't breach the contract. They can't argue that. They cannot argue, and they do not argue, that in fact the city was severely damaged as a result of that breach. And so faced with that, what they say is that the city's damages are uncertain and therefore were precluded. But the law in Georgia is not that if they're uncertain, we're precluded. Where the breach is clear and where the damages are clear, the issue that a plaintiff cannot prove with absolute precision, the precise amount of its damages, is not a bar to recovery. All that the plaintiff is required to do is to demonstrate a reasonable basis on which the finder of fact can base its decision on the amount of the damages. And we've done that. It's particularly more difficult because of Veolia's breach and when the breaching party is the cause of the uncertainty. Why is that so? Why is that so? Well, they don't get the benefit of their own malfeasance. It's clear that they breached the contract. Because this is a very complicated system, and I'm sure that the Court is familiar with it, it's a massive plant. And there are multiple, multiple thousands, multiple hundreds of thousands of interrelated parts all dealing with one goal, and that is to take the sewage that flows in from the City of Atlanta and surrounding municipalities, process it, remove all of the hazardous waste, take those solids out, and release clean water back to the environment. In order to do that, you have to operate multiple pieces of equipment, hopefully perfectly, but most of the time you have to operate with what you have. What Veolia left us with was a broken plant. They broke two of the main, we called them the heartbeat of the digestive. Why could you not separate out the dry side from the plant-wide? Take, for example, the major costs, the gas, the natural gas, the electricity, and the personnel. Those costs, the personnel salaries and benefits, all of those costs are tracked plant-wide. One man or one employee of the City doesn't just sit at a desk all day in one portion of the facility. They operate across the facility. One mechanic operates on a machine on one day or one hour on the dry side. He operates the next hour on the wet side. What about electricity and gas? They're not separately metered. There are no interior meters to the plant. Once the electricity comes to the main meter, you can't tell where it goes. There was a discussion, and they've made a point of this, and Your Honor said that you were familiar with the West CSO. That was a stand-alone facility, not part of the original R.M. Clayton plant. Certainly, we could allocate at least some direct costs for that because we know when it— What about on the monthly variation, wide monthly variation argument? What about his argument that taking the electricity and gas, if you instead of taking it calendar year, you made a one-month change, it would be a $3 million change. How do you answer that? Well, I agree that's a cute accounting trick. The problem is that the City is not like you and I. They don't pay their bills for electricity on a monthly basis. They get a bill in December. It may be February or March of the next year before they pay it. The average consumption of electricity is the same. The Court found that. There was demonstrated evidence of that. But the City doesn't pay for it. What you're telling me is the one-month problem that he pointed to was that kind of serendipitous situation. It's a timing on payment issue, not a timing on consumption. Okay. Let me tell you what bothers me most about your side of the case. It seems to me we might have a hard time finding the first two problems with your method clearly erroneous. And these are facts of our standards, clearly erroneous. But with respect to the capital improvements and the efficiencies, that seems to me to make a lot of sense that the comparison was distorted by reducing costs in period four because of those efficiencies. Should those not have been accounted for? Your Honor, we did address that in our evidence. What the evidence was that was presented by the City on remand was that the processes were essentially the same. Certainly, we might have had a new centrifuge. And we might have had, well, we did have two clean digesters because they had repaired them. You had two clean digesters and all four were clean. And all of your centrifuges were either repaired or replaced. Well, there is no evidence about when all four were cleaned. The two that were repaired, one of them had been cleaned by Veolia before they collapsed the lid. That was the digester 150. You still got three. We still had three. We had one that was clean, the 250. When we put it back in service after repairing the two lids, there is no evidence. And if Veolia had wanted to introduce it, they could have. But they didn't rebut this issue. They didn't present evidence on the issue. There was no evidence about the cleaning of those other two digesters or when they were cleaned. All it was was that we had four operational digesters, which is how the plant is supposed to operate. And it seems like one possible answer to the point they make is that it would be almost impossible to calculate what the efficiencies were and the extent of the efficiencies. Did you make that argument in the district court? We did not. Again, they didn't bring the evidence in that would require us to respond to it. But there is evidence. They didn't bring the evidence in. I agree with that. But they did make the argument about the capital improvements, and the district court did not address it. And your briefs to us don't address it. In the absence of evidence, there's nothing for the district court or this court to decide. In the absence of evidence, there's nothing. That argument, while it may be creative on Mr. Lowry's part. And your point, I guess, is that even though you have the burden of proof, you've presented enough of a prima facie case that if they either have to take the risk that the district court will accept it or they have to point specifically to flaws in it. And, in fact, Your Honor, I think it's important for the court to remember that they did attempt to present evidence to rebut the city's presentation. It was by Mr. Muirhead. They presented a single witness, Tim Muirhead. And the court found his presentation was, in the court's words, fatally flawed and was rejected. That meant that they had no rebuttal evidence. And in the absence of rebuttal evidence, there can be no clear error. Why did you use the fourth period only up to June of 2009 rather than going the full time until the flood happened, which, as I gather, is around August or September? It was middle September of that year. The reason that we stopped at the end of June was because it was the end of a fiscal year. The city generally— Would it have made any difference if you had gone through August? I'm not sure that we analyzed that. There certainly was no evidence of that. Did the other side put any evidence in that it would have made any difference? They did not. And as the court noted in its decision, there was an extensive discovery period. We made available to Veolia many hundreds of thousands of documents, particularly relating to those issues. The reason, to answer the court, is that was the end of our fiscal year. There are accounting adjustments that are made at the end of a fiscal year that make that accounting more reliable than if we had gone on into that stub period of 60 days. Well, on the other side of the comparison, you were able to use a 25-month period. Did that line up with fiscal year? It almost lined up with the fiscal year. Why couldn't it almost line up with the fiscal year on the other side? Well, there was less variation. I'll say that. That 25-month period, though, was clearly delineable because that's when the belt presses were in effect. That's when they were in use. If we're going to prove the avoided costs as a result or the alleged avoided costs, that's the period we had to analyze. Well, I mean, so you could have analyzed it in a period that didn't sync up to the fiscal year. We could have. You just chose not to. We could have. I believe it would have been unreliable because of the accounting procedures that the city follows. But the OLE also had the evidence that they could have, if they felt that was useful to their defense, raised that issue, and they chose not to. I'm going to switch you to the prejudgment interest. Yes, Your Honor. It seems to me that your opponent is dead right on both of these prejudgment interest issues. It seems to me that our Sunbeam case clearly holds that the post-judgment interest has to begin with the remand judgment. If, as the district court left it, your prejudgment interest terminates with the original district court judgment, you'd have a five-year gap. Georgia law controls this, not the federal law. Federal law controls the post-judgment interest. It seems to me, although I didn't find a case right on point, that Georgia, in no jurisdictions trying to be fair, would allow that five-year gap. Furthermore, it's pretty clear under Sunbeam that the remand judgment was modified in this case, and therefore the whole ball of wax was up for grabs. That was the controlling issue in the post-judgment. But the same kind of reasoning, it seems to me, should apply with the prejudgment. So as to that first issue, it seems to me Veolia is right. What's wrong with my thinking? Your Honor, I think that, as Mr. Lowry said, I believe that the issue is controlled by the court's earlier mandate. And what the court said was— Well, I don't agree with that. Pardon me? Tell me why. Well, the court said recalculate other damages calculations affected by these changes, such as the city's prejudgment interest. So when the court mandates to the trial court, this is what you do. Recalculate other damages calculations affected by these changes. The first damages that Mr. Lowry was talking about were not affected. They were not an issue in the first appeal. They were affirmed exactly as the trial court entered them in the first appeal. Those damages were not an issue. No, no. Wait a minute. The very fact that the city's damages were going to offset Veolia's damages meant that their damages were in flux. Their damages were not in flux. The amount of credit that the city was going to get was in flux. That doesn't mean that their damages are not fixed as of the first judgment in August of 2011. Well, the prejudgment interest is calculated on that net. Their damages less your damages. No, Your Honor. That's not how the trial court did it. The trial court measured the interest individually. We got an interest award. They got an interest award. And the reason for that is serendipitous. It wasn't good. But it has to do with the contract interest rate. The contract says that interest accrues on the breach at the prime rate at the time the money comes due. Veolia's damages came due at or before the day that we terminated in June of 2006. And the court heard an earlier case today about the meltdown that occurred in 2007-2008. That materially lowered the prime rate. So the city's damages, which occurred later, especially these belt press damages, they were not fixed until 2008. By the time our damages were fixed, the prime rate was three and a quarter. Their prejudgment interest rate is eight and a half. Just a timing issue. And so in order for the court to say, here's your principal amount and here's your interest, the court had to make an individual calculation for each side. Did the court lay that out and lay out that reasoning? I've never heard this before. Yes, Your Honor. It's actually in the calculations that we submitted to the court in our post-judgment briefing, both the first time and the second time. The interest issue did not come up until after a judgment was entered after the trial. And then Veolia and the city asked the court to reconsider certain aspects, including granting prejudgment interest. It was at that point that the parties briefed that. Okay, turning to the second prejudgment interest, it seems to me that the district court just made a mistake on that because he, in effect, gave Veolia no prejudgment interest, notwithstanding the fact that they had the damages. The city, I'm sorry, Veolia, the trial court did actually give Veolia prejudgment interest. The prejudgment interest is $2,208,000 on their $5.5 million of damages. The other aspect of their damages was a return of this letter of credit, $9.5 million. And what this court told the trial court is they only get interest on that if the city's damages do not exceed $9.5 million. Because our damages are in excess of $10 million, as the trial court found, they get no interest on the letter of credit. And, Your Honor, I will say— But you had that letter. The way, as I understand it, the first appeal, the district court awarded the letter of credit to you. No. And then he took it away. The district court had awarded it to you. The appellate court took it away. The trial court said we had to pay them back the letter of credit plus interest. Right. And then it came up on appeal, and this court said Veolia does not get interest unless the city's damages are less than the letter of credit. So the result was you had the letter of credit from the very beginning. We did. Which means you should not get any prejudgment interest to the full extent of that letter of credit, only on the excess, right? Well, that might have been the case if Veolia had raised that issue, but they didn't. And this is now—the city's entitlement to interest is, in fact, already decided in this case. If they had some question about what the mandate meant, the time was for them to make a motion for reconsideration before we went back down. I think I got that from your answer on the second—Veolia's second prejudgment interest. Your only answer is law of the case. Correct, Your Honor. And it seems to me that's just so unfair. We wouldn't apply law of the case even if that—even if the court said that. Your Honor, you talked about a five-year gap, and that might be the source of your concern about unfairness. There is no five-year gap. From the time prejudgment interest runs, the law is they get post-judgment interest. That has to do with the other prejudgment interest. It has to do with all prejudgment interest. From the time the judgment is entered, they get post-judgment interest. And so there is no gap. So on the other damages, the $5 million that was not at issue on appeal, there is no gap. They're getting post-judgment interest. Any other questions? I think we have your case. Mr. Lowry. A couple things on the interest issue that Judge Anderson raised. The 2005 Sunbeam mandate hadn't said anything to the district court about updating prejudgment interest through the new judgment either. I mean, the thing that Mr. Shepard says is missing from your 2013 mandate also wasn't in the 2005 Sunbeam mandate. Nonetheless, it was error for the district court not to update interest through the remand judgment. The 2011 judgment was one net number comprising the offsetting claims and defenses. Once you vacate that and for more work on the city's offset, there's no judgment left. We're not getting post-judgment interest. How do you answer his argument just made to me that the district court, because of the contract damages for prejudgment purposes, prejudgment interest purposes, he didn't do it the offset way? I don't think it's cogent. I mean, it is true. Is that what the district court did? The district judge assessed interest separately on each of our awards in finding out who was entitled to what. In reaching a judgment, it's a one net number in favor of Veolia. None of that has anything to do with the Sunbeam issue, which is how much longer should our prejudgment interest have continued. Sunbeam does not look to the level of alteration you made in the prior judgment. In Sunbeam, you affirmed the $6.6 million underlying award without qualification, and you remanded solely for recalculation of prejudgment interest. And that was enough of an alteration to require an update of the interest through the remand judgment. I mean, Sunbeam is a more extreme example of what I'm talking about than our case. I want to be sure you don't confuse one thing. The prejudgment interest I'm asking you for is not on the letter of credit. The prejudgment interest I'm asking you for are on our unpaid invoices from 2004 and 2005. That's with respect to your first issue, right? That's the first issue. As to the second issue, I think you understand why the mandate, A, doesn't dictate what Mr. Shepard said, and B, if it did, would be unjust and you wouldn't follow it, the mandate rule. Let me talk about the underlying avoided costs issue. First of all, in the briefing on monthly variation, you want to look at pages 34 to 39 of my lead brief and 9 to 12 of the reply brief. But I heard Mr. Shepard concede that the lumps, the huge lumps in differences in payments are timing issues. If that's the case, look at our brief and look at the math. It is timing issues that produce an $84,000 result his way and a $3.4 million result if the timing had simply been different. This whole model is driven by timing issues that no one says has anything to do with belt presses. Everybody, district court, their witness included, says these timing issues are rainfall, timing of payments, and timing of big purchases. That's what the city's model showed. Don't give up on that. We are absolutely right about that. This is a clearly erroneous finding. Now, on the capital improvements issue that Your Honor got to, the evidence that we cite that show, A, that there were capital improvements comes from the mouth of their own witness. The evidence that we cite about the efficiencies introduced to them come from the judge's prior findings and the evidence at the prior hearing, all of which are part of this record. He didn't strike a clean straight and say none of the prior evidence matters. This was a supplemental hearing to add on to the prior trial record. So, look at pages 39 to 43 of our lead brief where we collect evidence talking about the significance of these improvements. Now, there isn't a fact that… Mr. Larry, I know you're worried about your time. I'm more worried about answering your questions, Your Honor. Well, so here's what's worrying me about that. I mean, I think you did a beautiful job of kind of devastating the hypothetical used by the trial court. But, you know, we could go on forever, you know, sending it back and saying try again. I mean, that's why we have the clear error standard. I mean, there are going to be problems with any system by which he arrives at the avoided cause. And I'm not asking for perfection, Your Honor. Georgia law says reasonable certainty, no speculation, no conjecture. This doesn't get you to that hurdle. And clear error, do look at how the courts have interpreted that. In the context of a bench trial where there's no Seventh Amendment, clear error means, although there is some evidence to support the finding, when you look at all the evidence, you are left with a definite and firm conviction that a mistake has been made. You should have that conviction. These three errors weren't even addressed by the district court. If there were answers to them, they would be in the order. So would you have us send it back and say you have to do it? No, no. The city's had two bites at this apple. I don't even understand why they got a second bite. I know what happens when I show up here and I didn't prove my case the first time. You guys send me home without my supper. They've gotten a second supper. They blew it. The evidence is not sufficient. Yes, sir. My sentiment is very much like Judge Martin's here. I think that what the district court did and what the other side did was to present enough evidence such that we have a prima facie figure that is prima facie legitimate. It seems to me at that point, although the city has the burden of proof, you have to not only make an objection about capital improvements, for example, but you have to be specific. It makes this much difference. I don't agree that we've got to quantify the difference it makes. What I believe we have to do is show that there is a material variable that they don't account for. That makes a very significant difference in the result. Certainly. And let me just give you a quick hypothetical. If you want to analyze the efficiency of a driver driving a car and I told you here's my data and you said, wait a second, Lowry, this second pool of data comes after you rebuilt the engine and replaced the transmission. You wouldn't say, hey, and you've got to quantify the difference. You would throw that out as junk. That's what they did. They replaced the engine. They rebuilt the transmission. And they want you to assume that the same cost efficiencies apply. One last indulgence. Tiny mistakes in the calculation of operating costs in the comparison period make a huge difference. And we show this mathematically. Even a small off in the monthly calculation throws this model off by millions of dollars. We have your point. I thought you might have, Your Honor. Thank you very much. The court will be in recess under the usual order.